**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

**THADDEUS NORRIS, ERIC WALLACE, AHMAD WALTON, VINTRELL WHITE, and ENOCH ZARCENO-TURNER on behalf of themselves and all others similarly situated,**

*Plaintiffs,*

v.

**SHELBY COUNTY, TENNESSEE; MAYOR MICKELL M. LOWERY, in his official capacity; SHERIFF ANTHONY J. BUCKNER, in his official capacity; and SHELBY COUNTY COMMISSIONERS SHANTE AVANT, RHONDA O'DELL, MICHELE DIAL, MARK BILLINGSLEY, CHARLIE CASWELL, JR., HENRI E. BROOKS, WILL RICHARDSON, DR. KAREN STREETER, LASHANTA RUDD, MISKA CLAY-BIBBS, ERIKA SUGARMON, and AMBER HUETT-GARCIA, in their official capacities,**

*Defendants.*

**Case No. _______________**

Judge:
Magistrate Judge

---

**CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

---

**INTRODUCTION**







[1]

*"The facility is crumbling, and you know it …."*

1. Former Sheriff Floyd Bonner, Jr. wrote that warning to former Shelby County Mayor Lee Harris and the Shelby County Board of Commissioners on June 12, 2026, in a memorandum about the Shelby County Jail captioned "Life threatening Jail Maintenance Issues."

2. The Shelby County Criminal Justice Center at 201 Poplar Avenue in Memphis, Tennessee ("201 Poplar" or "the Jail"), which Sheriff Bonner oversaw until August 31, 2026, is in a state of perpetual crisis. It is aging and overcrowded. It floods with water and sewage. It is infested with mold and pests. It is swelteringly hot and poorly ventilated.

3. On or about June 6, 2026, the Jail's air conditioning failed. The Jail's own staff wrote to the former Mayor and the Board of Commissioners to report "ongoing inhumane and cruel conditions." (¶44, below). They reported temperatures "ranging from 88 to 95 degrees" at

[1] Unless otherwise noted, all photographs included in the Complaint have been reproduced from Appendix B of the report commissioned by Shelby County in 2025. *See* Jim Hart, *2025 Shelby County Jail Needs Assessment* (Univ. of Tenn. Cnty. Tech. Assistance Serv., May 27, 2025). Pg. 106.

100 percent humidity, "no ventilation whatsoever" in some areas, and "atrocious odor." Jail staff reported people incarcerated at the Jail—as well as staff—were suffering "heavy sweating, weakness, dizziness, nausea, rapid weak pulse," and in some cases, the appearance of "seizing." Jail staff reported that people were being transported to the emergency room with increasing frequency because of the heat.

4. Five days later, on June 12, 2026, former Sheriff Bonner confirmed the same facts to Shelby County officials, including the Shelby County Attorney and Chief Administrative Officer. He reported that, on a single day, sixteen housing units had been recorded above 80 degrees and nine more at 80 degrees; that the intake area stood at 85 degrees; that of the four chillers serving the "old" Jail and the Annex housing unit, one had been out of service for more than four years and the others were shut down, failed, or failing; and that the fans and water the Sheriff's Office had purchased could not meaningfully reduce the danger. **Exhibit 1**, June 12 Bonner Memo.

5. Then, on July 8, 2026, Chief Jailer Kirk Fields and County Commissioner Mark Billingsley[2] held a press conference to address the ongoing lack of air conditioning and extreme heat at the Jail. Chief Jailer Fields told the press that a "critical failure of the chillers" on June 6, 2026 had caused temperatures in some areas to rise to "about 92 degrees." Fourteen people incarcerated at the Jail required medical attention because of the heat, with one hospitalized, and five kitchen staff members overheated, some of whom could not return to work for six days. With temperatures at "80, 85 degrees," "everyone is at risk," Chief Fields concluded.

[2] Commissioner Billingsley had been elected by July 8, 2026, but did not take office until September 1, 2026.

6. In short, the Jail *is* crumbling. It is also overheated, overcrowded, and dangerous. And Defendants know it.[3]

7. The conditions at 201 Poplar violate the Fourteenth Amendment rights of the pretrial detainees confined there and the Eighth Amendment rights of the sentenced prisoners confined alongside them. They also violate Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act as to people with disabilities. Defendants have long been on notice of these conditions and of the constitutional deprivations occurring daily at 201 Poplar, yet have failed to timely or effectively remedy these life-threatening conditions.

8. Plaintiffs Thaddeus Norris, Eric Wallace, Ahmad Walton, Vintrell White, and Enoch Zarcceno-Turner, on behalf of themselves and all others similarly situated, seek declaratory and injunctive relief under 42 U.S.C. § 1983, Title II of the ADA, and Section 504 of the Rehabilitation Act to remedy the life-threatening and unconstitutional conditions at 201 Poplar. Plaintiffs seek no damages.

**JURISDICTION AND VENUE**

9. This is a civil rights class action arising under 42 U.S.C. § 1983, 28 U.S.C. § 2201 et seq., Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 et seq., Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and the Eighth and Fourteenth Amendments to the United States Constitution.

[3] Current Sheriff Anthony Buckner described the facility as "crumbling" in 2024. *See* Jessica Gertler, *Jail Repair Cost Reaches $15.5M; Sheriff's Office Says No Way to Save 'Crumbling' Building*, WREG, Sept. 4, 2025, https://wreg.com/news/investigations/jail-repair-cost-reaches-15-5m-sheriffs-office-says-no-way-to-save-crumbling-building/ (quoting Anthony Buckner about jail conditions in September 2024: "It frightens me where we'll be a year from now, where will be two years from now.").

10. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1343 (civil rights jurisdiction).

11. This Court has authority to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure, and injunctive relief under Rule 65.

12. Venue lies in this Court under 28 U.S.C. § 1391(b) because Defendants reside in this district and because a substantial part of the events and omissions giving rise to these claims occurred, and continues to occur, in this district.

## PARTIES

### *A.* Plaintiffs

13. **Plaintiff Thaddeus Norris** is a pretrial detainee held at the Shelby County Criminal Justice Center at 201 Poplar Avenue, Memphis, Tennessee. He has been in custody at the Jail since July 21, 2025. He is being held on a $750,000 bond, which he cannot afford. His current housing location is on the 4th floor, A pod, cell 20. He has mental health diagnoses that require him to take Abilify (aripiprazole) and Remeron (mirtazapine).

14. **Plaintiff Eric Wallace** is a pretrial detainee held at the Shelby County Criminal Justice Center at 201 Poplar Avenue, Memphis, Tennessee. He is also being held on a violation of parole. He has been in custody at the Jail since May 20, 2025. He is being held on a $35,000 cash bond, which he cannot afford. His current housing location is on the 2nd floor, B pod, cell 12—a specialized medical unit. He has a damaged hip and back, Type II diabetes, and anxiety. He takes medication for his diabetes and anxiety.

15. **Plaintiff Ahmad Walton** is a pretrial detainee held at the Shelby County Criminal Justice Center at 201 Poplar Avenue, Memphis, Tennessee. He has been in custody at the Jail since April 22, 2026. He is being held on a $300,000 cash bond, which he cannot afford. His current

housing location is on the 3rd floor, S pod, cell 14. S pod is a segregation pod. When he is not in segregation Mr. Walton is housed on the 3rd floor, G pod.

16. **Plaintiff Vintrell White** is a pretrial detainee held at the Shelby County Criminal Justice Center at 201 Poplar Avenue, Memphis, Tennessee. He has been in custody at the Jail since July 22, 2026. He is being held on a $27,500 cash bond, which he cannot afford. His current housing location is on the 3rd floor, pod F, cell 8. He is immunocompromised and has a colostomy bag.

17. **Plaintiff Enoch Zarceno-Turner** is a post-conviction detainee. He is being held at the Shelby County Criminal Justice Center at 201 Poplar Avenue, Memphis, Tennessee. His current housing location is on the 3rd floor, B pod, cell 12. He has been in custody at the Jail since September 14, 2019.

***B.*** **Defendants**

18. **Defendant Shelby County, Tennessee**, is a political subdivision of the State of Tennessee. Shelby County owns 201 Poplar and is responsible under Tennessee law for erecting and keeping its county buildings "in order and repair at the expense of the county, under the direction of the county legislative body," and is authorized to levy a special tax for that purpose. Tenn. Code Ann. § 5-7-106. Tennessee law further provides that "[t]he county jail shall be properly heated and ventilated and have sufficient sewerage to ensure the health and comfort of the inmates." Tenn. Code Ann. § 5-7-110(b).

19. **Defendant Mickell M. Lowery** is the Mayor of Shelby County and is sued in his official capacity. He was sworn into office on September 1, 2026. His predecessor was former Mayor Lee Harris.

20. **Defendant Anthony J. Buckner** is the Sheriff of Shelby County and is sued in his official capacity. Sheriff Buckner was sworn into office on August 31, 2026. Before being elected Sheriff, he served as Chief Deputy for the Shelby County Sheriff's Office. He is the custodian of the people confined at 201 Poplar and is the final policymaker for Shelby County with respect to the operation of the Jail.

21. **Defendants Shante Avant, Rhonda O'Dell, Michele Dial, Mark Billingsley, Charlie Caswell, Jr., Henri E. Brooks, Will Richardson, Dr. Karen Streeter, Lashanta Rudd, Miska Clay-Bibbs, Erika Sugarmon, and Amber Huett-Garcia** are the members of the Shelby County Board of Commissioners and are sued in their official capacities. The Board of Commissioners is the county legislative body of Shelby County. It holds the appropriation and taxing authority necessary to fund the repairs, replacements, capital improvements, and staffing required to bring 201 Poplar into constitutional compliance. Tenn. Code Ann. §§ 5-7-106 and 5-7-111 assign responsibility for the condition of the County jail to this body

22. At all relevant times, each Defendant acted under color of state law.

23. The acts and omissions alleged herein are the result of Shelby County's policies, customs, and practices, including its decisions about how to fund, staff, maintain, and operate 201 Poplar, and its persistent failure to correct known and repeatedly documented life-threatening defects. *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

## FACTUAL ALLEGATIONS

### I. <u>An Aging, Overpopulated Jail.</u>


[4]

24. 201 Poplar broke ground on June 21, 1977, and opened in 1981. It consists of a six-floor building (the "Tower") and a smaller two-story building, the Annex. The fifth and sixth floors of the Tower—dormitory-style housing units—were added in 1990. Before a major riot in 1991, the third and fourth floors of the Tower consisted entirely of single-bunk cells; because of a need for additional housing, those floors were converted to two-person cells. The kitchen was expanded in 2001, and the 256-bed Annex was constructed in 2002. **Exhibit 2**, 2025 Needs Assessment.

25. The Tennessee Corrections Institute ("TCI"), which is responsible for developing and enforcing local jail standards for the state, has certified 201 Poplar for 2,471 beds. **Exhibit 3**, TCI JDS Report. The majority of these beds are in the older Tower (the "old Jail"), not the Annex. The Annex is where lower-level security detainees are housed. It is also where most of the jail staff offices are located.

26. On May 16, 2024, then-Sheriff Floyd Bonner requested that the University of Tennessee's County Technical Assistance Service ("CTAS") prepare a master plan for the Shelby County Jail. Jail management consultant Jim Hart conducted the assessment over multiple site

[4] A picture of the Annex (white roof) and Tower (brown brick) at 201 Poplar Avenue, Memphis, Tennessee. *See* Gertler, supra note 2.

visits in 2024 and January 2025 and delivered the 2025 Shelby County Jail Needs Assessment on May 27, 2025 ("Needs Assessment") . **Exhibit 2**, 2025 Needs Assessment.

27. According to the 2025 Needs Assessment, a jail is functionally full at approximately eighty percent of its rated bed capacity, because the remaining margin is what permits the facility to classify and separate people by risk and need. For 201 Poplar, that figure is 1,977 beds.

28. As of July 2026, the Jail's population was 2,800—nearly 400 people over capacity (2,471) and nearly one thousand people over the recommended capacity (1,977). **Exhibit 4**, July 2026 Jail Report Card.

29. The Jail's population has exceeded capacity (2,471) every month since June 2024. The Jail has not been at or below recommended capacity (1,977) since May 2021. *Id*.

30. Overcrowding at 201 Poplar leads to, among other things, people being housed in "out of service" cells. According to the Needs Assessment, in July 2024, the Sheriff's Office "Beds Out of Service" roster listed 312 beds out of service at 201 Poplar. The Needs Assessment found that the true number was likely higher, because during tours of the housing pods the consultant found numerous cells in which the lights did not work, the sink or commode did not work, bunks had been vandalized past usefulness, or the cell door did not function—"yet inmates were housed in them."

31. The Jail is also chronically understaffed. In July 2025, the Sheriff's Office reported 444 authorized full-time positions and 330 full-time staff—114 vacancies. In June 2026, it reported 503 authorized positions and 444 full-time staff—59 vacancies. TCI's 2025 inspection found that "low staffing levels are impacting the operational challenges" at the facility.

32. Understaffing is not incidental to the constitutional violations alleged here. It is the mechanism by which many of them operate: a facility that cannot staff its housing units cannot conduct timely security checks, cannot move people to recreation or showers, cannot process people out of intake, and cannot evacuate them in the event of a fire.

33. Likewise, years of overcrowding compounds the constitutional violations alleged here. Each person confined to the jail generates heat and expelled air and contributes to the routine "wear and tear" on the Jail's physical plant and utilities.

## II. "Two Men in a Casket": Unbearable Heat and Failed Ventilation.

### *A. High temperatures and heat index.*

34. On September 4, 2026, the National Weather Service ("NWS") placed the Mid-South, including Memphis, under an areawide Heat Advisory for heat indices of 100 to 109 degrees for at least the following week.

35. The first eight days of September 2026 were the hottest start to the month of September on record in Memphis, with an average temperature of nearly ten degrees above normal. Six separate days reached 100 degrees or hotter.[5]

36. On September 6, 2026, Memphis reached 103 degrees, tying the hottest September day ever recorded in Memphis.

37. Temperatures in Memphis are likely to remain high throughout September. According to the NWS, the average daily high temperature in September (when there is not record-breaking heat) is 86 degrees Fahrenheit.

[5] Erik Proseus, *Hottest start to September on record, but when will summer end?,* MemphisWeather.Net (Sept. 9, 2026, 8:27 PM CDT), https://www.memphisweather.net/blog/2026/09/09/hottest-start-to-september-on-record-but-when-will-summer-end/.

38. Because moisture in the air (humidity) prevents perspiration (or sweat) from evaporating off a human body, a body is less able to cool itself in humid weather. For this reason, heat is often measured not just in terms of temperature but in "apparent temperature," which estimates the combined effect of temperature and humidity on the human body. This is also called a "heat index."

39. The NWS publishes a chart and index that illustrate how exposure to high heat indexes increases the risk of heat-related illnesses. See below:

**NWS Heat Index** Temperature (°F)

| Relative Humidity (%) | 80 | 82 | 84 | 86 | 88 | 90 | 92 | 94 | 96 | 98 | 100 | 102 | 104 | 106 | 108 | 110 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 40 | 80 | 81 | 83 | 85 | 88 | 91 | 94 | 97 | 101 | 105 | 109 | 114 | 119 | 124 | 130 | 136 |
| 45 | 80 | 82 | 84 | 87 | 89 | 93 | 96 | 100 | 104 | 109 | 114 | 119 | 124 | 130 | 137 | |
| 50 | 81 | 83 | 85 | 88 | 91 | 95 | 99 | 103 | 108 | 113 | 118 | 124 | 131 | 137 | | |
| 55 | 81 | 84 | 86 | 89 | 93 | 97 | 101 | 106 | 112 | 117 | 124 | 130 | 137 | | | |
| 60 | 82 | 84 | 88 | 91 | 95 | 100 | 105 | 110 | 116 | 123 | 129 | 137 | | | | |
| 65 | 82 | 85 | 89 | 93 | 98 | 103 | 108 | 114 | 121 | 128 | 136 | | | | | |
| 70 | 83 | 86 | 90 | 95 | 100 | 105 | 112 | 119 | 126 | 134 | | | | | | |
| 75 | 84 | 88 | 92 | 97 | 103 | 109 | 116 | 124 | 132 | | | | | | | |
| 80 | 84 | 89 | 94 | 100 | 106 | 113 | 121 | 129 | | | | | | | | |
| 85 | 85 | 90 | 96 | 102 | 110 | 117 | 126 | 135 | | | | | | | | |
| 90 | 86 | 91 | 98 | 105 | 113 | 122 | 131 | | | | | | | | | |
| 95 | 86 | 93 | 100 | 108 | 117 | 127 | | | | | | | | | | |
| 100 | 87 | 95 | 103 | 112 | 121 | 132 | | | | | | | | | | |

**Likelihood of Heat Disorders with Prolonged Exposure or Strenuous Activity**

Caution Extreme Caution Danger Extreme Danger

| Classification | Heat Index | Effect on the body |
|---|---|---|
| Caution | 80°F - 90°F | Fatigue possible with prolonged exposure and/or physical activity |
| Extreme Caution | 90°F - 103°F | Heat stroke, heat cramps, or heat exhaustion possible with prolonged exposure and/or physical activity |
| Danger | 103°F - 124°F | Heat cramps or heat exhaustion likely, and heat stroke possible with prolonged exposure and/or physical activity |
| Extreme Danger | 125°F or higher | Heat stroke highly likely |

40. According to the Shelby County Sheriff's Office ("SCSO") staff, temperatures at the Jail reached "88 to 95" degrees with humidity "at 100%." (*See* ¶ 44). These conditions would generate a heat index of over 112 degrees and place the Jail's occupants in "danger" or "extreme danger" where heat exhaustion and heat stroke are likely.

41. Relative humidity in the ambient air in Memphis normally ranges between 67% and 62% in the warmer months between May and September. Even at these lower rates of relative humidity, a temperature of 86 degrees would have a heat index of 91-93 degrees Fahrenheit.

42. The NWS urges "extreme caution" for heat indices over 90 degrees.

*B. Sheriff and SCSO staff report extreme temperatures in the Jail.*

43. The air-cooling system serving the Jail stopped working on or about June 6, 2026.

44. In June 2026, jail staff of the Shelby County Sheriff's Office wrote directly to Mayor Harris and to each of the thirteen members of the then-Board of Commissioners by name, to inform them of "the ongoing inhumane and cruel conditions" at the Jail. See below:

To the Shelby County Officials:

District 1: Amber Mills
District 2: David C. Bradford, Jr. (Chair Pro Tempore)
District 3: Mick Wright
District 4: Brandon Morrison
District 5: Shante K. Avant (Chairwoman)
District 6: Charlie Caswell, Jr.
District 7: Henri E. Brooks
District 8: Mickell Lowery
District 9: Matthew T. Szalaj
District 10: Britney Thornton
District 11: Miska Clay-Bibbs
District 12: Erika Sugarmon
District 13: Michael Whaley

Mayor Lee Harris

I am emailing to inform you of the ongoing inhumane and cruel conditions in the Criminal Justice Center located at 225 Poplar Avenue. The air conditioning unit stopped working on Sunday, June 7, 2026. Be advised, due to prolonged heat exhaustion the inmates and employees are experiencing heavy sweating, weakness, dizziness, nausea, and a rapid, weak pulse and more are giving the appearance of seizing. There is no ventilation what so ever in these particular areas. Also, mold toxicity occurs when prolonged exposure to indoor mold triggers systemic inflammation and immune distress. The odor in here is atrocious and the condensation has intensified. The Sheriff have provided water and fans, which are blowing hot air. The temperatures are ranging from 88 to 95 degrees, humidity is at 100%. The extreme heat in this jail is an urgent, growing crisis. Uncontrolled temperatures in older concrete facilities regularly exceed 100°F, severely threatening the health, safety, and constitutional rights of inmates and jail staff. More frequently, inmates are being transporting to the ER due to their symptoms.
I am requesting your immediate assistance at this time.

Respectfully,
SCSO Jail Staff

45. SCSO staff reported that the air conditioning had stopped working on Sunday, June 7, 2026[6]; that because of prolonged heat exhaustion both incarcerated people and employees were

[6] This is in contradiction with Chief Field's statement at the July 8, 2026 press conference. There, Fields stated that air conditioning failed on June 6, 2026.

experiencing heavy sweating, weakness, dizziness, nausea, and a rapid, weak pulse; and that some were giving the appearance of seizing.

46. SCSO staff reported that the Sheriff had provided water and fan, but the fans were "blowing hot air."

47. SCSO staff reported temperatures ranging from 88 to 95 degrees, at 100 percent humidity, and stated that "[t]he extreme heat in this jail is an urgent, growing crisis." Staff further reported that people incarcerated at the Jail were being transported to the emergency room more frequently because of the heat, and requested the officials' immediate assistance.

48. On June 12, 2026, then-Sheriff Bonner confirmed these conditions. Bonner wrote to Mayor Harris and the Board of Commissioners, cc'ing the Shelby County Attorney and Chief Administrative Officer, under the caption "Life threatening Jail Maintenance Issues." **Exhibit 1**, June 12 Bonner Memo.

49. Under the heading "Temperatures Critically High," the Bonner advised Defendants that TCI standards allow Jail temperatures to reach a maximum of 80 degrees. Bonner advised Defendants that on the preceding day, sixteen housing units had been recorded at over 80 degrees and nine were at 80 degrees. Bonner advised Defendants that the intake area had already reached 85 degrees.

50. Bonner advised Defendants that the Sheriff's Office was preparing to buy portable air conditioning units; that it had already bought additional water coolers and fans; that "fans do not have significant impact in these high temperatures"; and that there was a danger in running so many extension cords within easy grasp of the population.

51. He concluded: "This is not sustainable."

52. Bonner advised Defendants that medical staff at the Jail were reported to be considering a job action because of the working conditions created by the high temperatures, and that jail staff and others working in intake were likewise suffering, along with the people in custody.

53. As the heat failed to improve, Chief Jailer Kirk Fields and Commissioner Mark Billingsley—joined by SCSO staff, union representatives, and kitchen staff—held a press conference on July 8, 2026. Chief Jailer Fields told the press that a "critical failure of the chillers" had caused temperatures in some areas of the Jail to rise to 92 degrees. Temporary chillers had provided some relief but were not a long-term solution and some parts of the Jail remained "in the upper 70s."

54. Chief Fields confirmed that fourteen people incarcerated at the Jail required medical attention because of the heat, with one hospitalized, and five kitchen staff members overheated, some of whom could not return to work for six days.

*C. The Jail's failing cooling and ventilation system.*

55. A building's HVAC system has four components. The plant converts electrical or gas energy into heating or cooling and produces heated or chilled water. That water circulates to the air handling units, which use it to heat or cool air, dehumidify that air, and mix outside air with recirculated indoor air. Ducts carry the conditioned air into occupied space. Diffusers and grilles ("vents") deliver it.

56. Air conditioning and ventilation perform different functions. Air conditioning cools and dehumidifies air. Ventilation brings fresh, outside air into an occupied space to dilute the pollutants that accumulate there. A jail, like any indoor residential facility, requires both air conditioning and ventilation.

57. The Jail is cooled by chillers, which cool air with cold water, as opposed to air conditioning, which cools air with a chemical refrigerant.

58. According to former Sheriff Bonner's June 2026 memo, the "old" Jail (meaning the Tower, where Plaintiffs are housed) is served by two chillers, which were rebuilt "about a year ago." Of those two chillers, one is "shut down" and the other is "close to inoperable." According to Bonner, "both should have been fixed" but were not.

59. According to Bonner, the Annex housing area is served by two chillers. As of June 12, 2026, one had been "down for over four years" and the other "had failed." But, "there is a temporary chiller in the parking lot."

60. According to Bonner, the Annex kitchen (where all the food for the Jail is prepared) is served by two chillers. As of June 12, 2026, one of the Annex kitchen chillers was "down" and the other was "struggling." The Sheriff advised Defendants that there was insufficient backup if the struggling chillers failed.

61. In sum, as of June 12, 2026, of the six chillers serving the Jail, Bonner reported that four were inoperable, two were close to inoperable or "struggling," and there was only one emergency replacement chiller for the entire Jail.

62. On July 9, 2026, news outlets reported that possibly three "emergency" chillers were operating at the Jail.[7] However, according to Bonner's previous report, that would still leave the Jail with three inoperable chillers—meaning half of the chillers required to cool the Jail were still inoperable.

---

[7] Deja Davis, *Emergency chiller delivered to Memphis jail amid heat crisis*, WREG, July 9, 2026, https://wreg.com/news/local/emergency-chiller-delivered-to-memphis-jail-amid-heat-crisis/ (last visited Sept. 2, 2026).

63. On August 24, 2026, the Commission took up a resolution to approve a contract with CS3, Inc. for an emergency purchase order for $69, 524.10 for "temporary Chiller Services at the Jail Annex located at 271 Poplar Avenue."

64. Per the resolution, this emergency provision would only provide temporary chiller services at the Annex. None of the Plaintiffs are housed in the Annex.

65. These failures did not occur without warning. TCI identified the Jail's climate control systems as requiring extensive repair or replacement as early as February 2018.

66. The Needs Assessment further recorded that "[m]any of the housing areas were extremely warm" and that "[t]o compensate, corrections staff have left open the exterior housing unit solid doors at the risk of safety and security."

67. The Needs Assessment indicated the extremely warm temperatures likely violated the American Correctional Association standard requiring that temperature "is mechanically raised or lowered to acceptable comfort levels," ACA Standard 5-ALDF-1A-19.

68. Chief Jailer Fields also admitted at the July 8 press conference that the Jail's air-conditioning and HVAC problems were not confined to summer. "We have even had HVAC issues even during the winter months," he told reporters.

69. The Jail's ventilation is also inadequate. In 2021, in *Busby v. Bonner*, No. 2:20-cv-02359 (W.D. Tenn.), the County hired mechanical engineers Steve Stephens and Jeff Haltom to conduct a ventilation study of the Shelby County Jail. Stephens and Haltom reported their findings on December 22, 2021. Their report was filed in that action. **Exhibit 5**, Expert Executive Report.

70. Experts Stephens and Haltom found that approximately 30 of the Jail's 73 air handling units did not provide the minimum outdoor airflow rates required by applicable codes

and standards, and that, therefore, approximately 35 percent of the Jail's air handling units did not meet ANSI/ASHRAE Standard 62.1 for circulating fresh, outdoor air.

71. They found that few of the Jail's 73 systems achieved an air-filtration rate the complies with modern standards, and that of the ten units they physically surveyed, only one met the modern air filtration standard ("MERV-13"); the remainder did not meet those filtration standards.

72. They found that the bipolar ionization air cleaners the County had installed on all of the Jail's air handling units lacked recognized independent third-party testing establishing their effectiveness.

73. They found that most of the Jail's air systems predate modern ventilation control technology, and that the ionization units had been installed with few other changes to the systems—no adjustment of outside air amounts, no adjustment of filter efficiency, and no ventilation control changes or modernization.

74. They concluded that the Jail's HVAC system did not meet the minimum requirements of the applicable ventilation, filtration, and air cleaning recommendations.

75. Ventilation and HVAC challenges were documented again in the County's own 2025 Needs Assessment, which found that on the fifth floor these challenges related in part to maintenance access and the inability to properly sanitize for preventative maintenance, and created "extreme challenges."

  [8]

76. The Needs Assessment further recorded that cells in the medical clinic were ventilated with fans "due to poor ventilation in this area."

[9]

77. An air handling unit that does not deliver the required minimum outdoor airflow does not dilute the pollutants accumulating in the space it serves. To save energy and costs, sometimes older systems can be programed to recirculate already-cooled indoor air rather than

[8] Pictures showing detritus on HVAC/ventilation system. **Exhibit 2**, 2025 Needs Assessment, pgs. 110-11.
[9] Picture showing fans used due to poor ventilation. **Exhibit 2**, 2025 Needs Assessment, pg. 121.

drawing in hot outside air and cooling it down. While this cuts down on energy uses and costs, it greatly reduces indoor air quality.

78. The recognized service life of a chiller or an air handling unit is approximately thirty years, and of a terminal unit thirty to thirty-five years—less in a jail, where the systems run continuously and maintenance access is poor. 201 Poplar opened in 1981. Upon information and belief, these units are likely outdated.

79. Overcrowding compounds every one of these failures. A human body can generate as much heat as a 100-watt lamp; humans also expel carbon dioxide when they breathe. Doubling the number of human bodies in a housing unit therefore requires more air both to cool the space and to maintain acceptable indoor air quality. An overcrowded housing unit served by an air system that was inadequate to begin with will have both poor cooling and poor indoor air quality.

80. Poor indoor air quality in a congregate correctional setting increases the rate at which respiratory infections spread among a population that cannot distance itself. Reduced indoor air quality also exacerbates existing respiratory conditions like asthma and chronic obstructive pulmonary disease. It also produces the moist conditions in which mold grows and metal rusts.

*D. The new cell doors have cut off airflow into the cells.*

81. In December 2024, the County commenced a door and locking retrofit at 201 Poplar. TCI reported in June 2026 that "the installation of new doors throughout the facility is nearing completion."

82. The new cell doors are solid and replace old cell doors that had bars along the top half of the door. The old doors' bars allowed air to flow between the open area of the pod ("dayroom") and individual cells.

 [10]

83. Upon information and belief, each dayroom on the Jail's third and fourth floor pods is equipped with up to four vents that push conditioned (cooled and de-humidified) air into the large space.

84. Each cell in these pods contains an exhaust vent beneath the bed, about six to twelve inches off the ground. This exhaust vent extracts air and expels it outside through a system of ducts that run behind each cell.

85. Class representatives report that since the new doors were installed, the airflow between the (poorly) air-conditioned dayroom and the individual cells has been completely shut off. When the cell door is closed, no conditioned air enters the cell. The cell only has an exhaust vent pulling air out.

86. Conditioning a dayroom does not condition the cells that open onto it once those cells are sealed. A cell requires an air supply of its own—a combination of fresh outside air and cooled air pushed into the cell—together with a return or exhaust path to draw air out.

[10] Pictures showing older version of door jail with open bars on the top half (cell 11). **Exhibit 2**, 2025 Needs Assessment, pg. 107.

87. Class representatives on the third and fourth floors of the jails report spending up to 23 hours a day in their sealed cells.

88. A cell with two people inside with a closed, solid door and no forced, conditioned air will be substantially hotter than the common area outside it. On a warm summer day, upon information and belief, the difference between the temperature in the dayroom and in the cells can be ten to fifteen degrees. Depending on conditions, it may be greater.

89. Consequently, the temperatures Defendants have measured, if only measured in large spaces like dayrooms and intake, understate what Class representatives actually experience. Every temperature the Sheriff reported to Defendants on June 12, 2026—the sixteen housing units above 80 degrees, the nine at 80 degrees, and the 85-degree intake area—is likely a reading taken in a common area rather than inside a cell. Where the Sheriff's own staff reported temperatures of 88 to 95 degrees at 100 percent humidity, the cells opening onto those spaces were likely hotter still.

90. Defendants modified the physical plant of 201 Poplar by installing solid cell doors without accounting for the effect of that modification on the building's ventilation system. Upon information and belief, this modification likely does not conform with applicable building and ventilation codes, especially because the Jail likely already was not complying with ventilation standards per the County's own expert report from 2021.

91. Class representatives report that the HVAC system at 201 Poplar is shut off overnight, leaving people locked in sealed cells overnight with even less air. This extreme heat and lack of ventilation led one class representative to describe sleeping one of these cells with another person as "two men in a casket."

92. Tennessee's minimum standards for local correctional facilities require forced air ventilation in "sleeping and activity areas." A single cell at a minimum, must have a high security light fixture; an unbreakable toilet and sink with the control valve located outside the cell; *forced air ventilation*; and a concrete bed. Tenn. Comp. R. & Regs. 1400-1-.04(2)(b) (emphasis added). A special purpose or temporary holding cell for persons under the influence of intoxicants must have, at a minimum, a flushable drain or unbreakable toilet and sink; a high security light fixture; *forced air ventilation*; and no structural projections. *Id*. 1400-1-.04(10)(a) (emphasis added).

93. Tennessee law separately requires that "[t]he county jail shall be properly heated and ventilated and have sufficient sewerage to ensure the health and comfort of the inmates." Tenn. Code Ann. § 5-7-110(b).

94. The applicable professional standard requires that a ventilation system supply at least 15 cubic feet per minute of circulated air per occupant, with a minimum of 5 cubic feet per minute of outside air, and that toilet rooms and cells containing toilets receive no fewer than four air changes per hour, with air quantities documented by a qualified technician. ACA Standard 5-ALDF-1A. Upon information and belief, the Jail does not comply with these standards.

*E. Effects of Heat Exposure.*

95. Prolonged exposure to high heat indices exposes people to a substantial risk of harm. That harm includes both heat-related illnesses (such as heat exhaustion and heat stroke) and the worsening of underlying conditions such as asthma, chronic obstructive pulmonary disease, congestive heart failure, depression, anxiety, diabetes, and cardiovascular disease. Worsening of these conditions can lead to serious and potentially fatal exacerbations of these conditions, such as myocardial infarction, strokes, shortness of breath, suicide attempts, dehydration and electrolyte disturbance, and asthma attacks.

96. Heat-related illnesses occur when the body's temperature control system is overloaded, and the body is unable to adequately dissipate heat. At lower heat indices, people are already exposed to a risk of harm, but the risk for heat stroke and other heat-related illnesses increases sharply when the heat index exceeds 88° Fahrenheit.

97. Above 88° F heat index, the risk increases dramatically. But a detainee exposed to a heat index of 88° F for a very short time has also been exposed to heat indexes in the low to mid-80s, which is also harmful.

98. Heat-related illnesses include heat syncope (fainting), heat cramps, heat exhaustion, and heat stroke.

99. Heat syncope (fainting) is a brief loss of consciousness that results from heat exposure. Heat cramps are painful muscle cramps that result from salt and water loss during heat exposure. Heat exhaustion results when heat stress begins to overwhelm the ability of the body to dissipate heat. Body temperature elevates and the heartbeat is rapid. A person with heat exhaustion may feel light-headed, thirsty, nauseous, weak, faint, dizzy, or have unsteady gait. Heat stroke occurs when body temperature is elevated above 105.5 degrees. Heat stroke can cause death or permanent disability without emergency treatment.

100. Certain people are at higher risk for heat-related harm—such as people over the age of 65, people with certain medical or mental health conditions, and people who take certain medications.

101. Medical conditions that affect the cardiovascular system, like asthma, hypertension, chronic obstructive pulmonary disease, and congestive heart failure, can put a person at higher risk of heat-related illness. One of the ways the body cools itself is through dilation of blood vessels close to the skin (vasodilation). When the body needs to emit heat, the heart pumps faster and

squeezes harder to pump more blood to the skin. Diseases that affect blood circulation can therefore prevent a body from cooling down through vasodilation.

102. Commonly prescribed medications can also sharply increase the risk of heat illness because they impair the body's two primary cooling mechanisms—sweating and vasodilation. Beta blockers, calcium channel blockers, and diuretics, all used to treat hypertension, depress cardiac function and reduce the volume of blood the heart can circulate to the skin. Anticholinergic drugs—including antihistamines, cyclic antidepressants, phenothiazines, and butyrophenones—impair sweat gland function; the latter two classes are widely prescribed to people with serious mental illness. Selective serotonin reuptake inhibitors likewise interfere with cooling because of their effect on the hypothalamus—the part of the brain that regulates body temperature.

103. Apart from causing heat-related illnesses, heat stress also exacerbates underlying chronic conditions, such as pulmonary or heart disease, causing a substantially increased risk of serious and potentially fatal consequences. Heat exposure increases morbidity and mortality from underlying medical conditions and often poses a greater threat to health and life than heat-related illnesses.

104. People living in confined spaces are at risk. A person free to respond to a hot environment takes ordinary self-protective steps: seeking a cooler location, wetting the body and clothing, creating cross-ventilation, and moving away from structures that absorb and radiate heat. People confined at 201 Poplar can do none of these things. They cannot leave their housing units (often they cannot even leave their cells), cannot control the ventilation, cannot obtain a cool shower, and cannot obtain ice or cold water except as staff occasionally provide it.

105. Heat-related illness is preventable. Air conditioning has been shown to be an extremely effective way to prevent heat-related illnesses.

106. Electric fans may provide some degree of comfort, but fans alone do not prevent heat stroke when heat and humidity become extreme. When the environment has high humidity, the air is already saturated with moisture, causing sweat to evaporate less quickly from the surface of the skin. Therefore, the body cannot engage in evaporative cooling as efficiently, leading to increased heat stress. As a result, in humid conditions, the risk of heat-related illness increases and fans that simply circulate humid air are not effective at cooling.

107. Where exposure to heat cannot be avoided (e.g. through air conditioning), the Centers for Disease Control and Prevention recommend frequent cool showers and an ample and continuous supply of cold drinking water and ice.

108. On information and belief, the population confined at 201 Poplar includes a substantial number of people with hypertension, diabetes, cardiovascular disease, chronic pulmonary disease, obesity, and serious mental illness, and a substantial number who take one or more of the medication classes described above.

*F. Class representatives' experience of the heat.*

109. Class representatives report feeling the physical and mental effects of heat exposure, including sweating, dizziness, muscle cramps, heat rash, confusion, and an inability to sleep.

110. Class representatives describe the temperature in the Jail as "unbearable," "excessively hot and humid," "extremely hot," "like walls closing in," "a 10 on a scale of 1 to 10," "it feels like triple digits," and "sweltering."

111. They report it is too hot to wear clothing and that most men in their units do not wear shirts for most of the day. "We just sweat all day," one person explained.

112. Class representatives cannot sleep at night because of the heat. They report sleeping an hour or two at a time. Many class representatives strip to their underwear and lay on the floor of their cells in an effort to cool off.

113. Class representatives report that it is particularly hot and humid at night. "I can't hardly breathe at night," one class representative explained.

## III. <u>Defendants' attempts to mitigate heat are inadequate and ineffective.</u>

114. Defendants' response to the heat emergency has consisted of fans, portable air conditioning units, water coolers, and temporary chillers—likely in a part of the Jail (The Annex) where Class representatives do not reside.

115. Fans do not prevent heat stroke at extreme temperature and humidity, as Bonner himself told Defendants. The SCSO staff reported that the fans were blowing hot air.

116. Moreover, Class representatives report that Jail staff position the fans near the sally port where SCSO officers sit rather than into the pods where detainees are housed.

117. Class representatives detail that the Jail sporadically provides ice or cold water (likely melted ice) in Igloo sports kegs. They report having never seen a portable air conditioning unit in their pod.

118. The Jail provides one or two water kegs per pod. Each pod contains around forty or more men.

119. Because class representatives on the third and fourth floors are confined to their cells 23 hours a day, they are dependent on jail staff or a "rockman" (a single individual in a pod with cleaning duties and special privileges) to fill up their water cups for them.

120. Cold drinking water is not available in detainees' cells. Only lukewarm water from their sink is available—when the water is not shut off.

121. Cold showers are never available. Showers only have one knob, for hot water only.

122. The temporary and rented cooling equipment is by definition impermanent. It does not repair the chillers, does not restore ventilation to cells, and does not address the underlying mechanical failures that TCI first flagged in 2018.

## IV. **"I Sat in a Plastic Chair for Three Days": Prolonged Intake Detention.**



*A. The intake process.*

123. People arrive at 201 Poplar in the vehicle sallyport, where they receive a brief medical and mental health screening at a window and pass through a body scanner. The screening station is a single window at which multiple arrestees and arresting officers wait in a group; questions and answers are exchanged through a speaker from a distance of approximately five feet, with no privacy and with difficulty hearing.

124. After screening, people move to the Law Enforcement Lobby, where warrant checks, fingerprinting, arrest data entry, property collection, and interaction with the judicial commissioner occur. Depending on the number of arrivals and the backlog inside jail booking,

people can remain in this area for several hours. There are three single-person holding tanks; when booking is backed up, the holding tanks back up too.

125. People are then moved into the open booking area. It is a large room with seating in the center and offices for medical, mental health, classification, pretrial services, booking, showers, and very few restrooms around the perimeter.

126. More than four in five of the 2,584 people booked into the Jail in July 2026 had been detained there before, and nearly half had been incarcerated six or more times, a pattern that held consistent across the first seven months of 2026 as a whole. Thus, many of the same individuals currently detained in the Jail will pass through intake again.

*B. Extremely long wait times.*

127. On October 16, 2024, the Needs Assessment found 139 people sitting in the open booking area, either in some stage of the booking process or waiting for a bed in a housing unit.

128. On December 17, 2024, the Needs Assessment found 90 people in that area. They had been there for periods ranging from less than several hours up to **nine days.**

129. Classification staff told the consultant responsible for the Needs Assessment that, because of the lack of available bedspace, people could remain in the seating area between one and five days waiting for a housing assignment.

130. The Jail's own data reflects wait times of 83 hours (July 2025) to 57 hours (July 2026). **Exhibit 4**, July 2026 Jail Report Card.

131. 201 Poplar was originally designed with a post-booking area where a person would wait for bedspace. That area is not sufficient in size and is not adequately staffed. As a result, everyone remains in the open booking area until they are either released or assigned a bed.

132. On June 12, 2026, then-Sheriff Bonner advised Defendants that intake was at 85 degrees—a temperature that the NWS assigns "caution" or "extreme caution" depending on the level of humidity.

133. In the same June 2026 memo, Bonner admitted that "[i]t already takes far too long to process people into the Jail" because of personnel shortages and a lack of funding approved by the County.

*C. Lack of space.*

134. Tennessee's minimum standards require at least 35 square feet of clear floor space in a single-occupancy cell, and at least 70 square feet of total floor space where the occupant is confined more than ten hours per day. Tenn. Comp. R. & Regs. 1400-1-.04(3).

135. A single plastic chair provides mere inches of space per person. People in intake are confined in this space twenty-four hours a day, for days on end.

*D. Class representatives' experience in intake.*

136. One class representative reports spending 26 days in the intake area waiting to be assigned housing. He reports that there were hundreds of people sitting in plastic chairs for days when he was there.

137. Another class representative spent 7 days in the intake area. He reports that the ceiling lights were also on, the T.V. was always on, and there were people yelling. At times, he would be taken out of his chair, told to take his shoes off, and put into a small holding cell bordering the intake area with 7-10 other people. The toilet in the small holding cell had overflowed with vomit and feces. He stood barefoot in vomit and feces for several hours. In the small holding cell, people had to take turns lying and sitting down because there was not enough room. He had to wait several days in intake to get a new colostomy bag after the colostomy bag he was wearing

when he was booked into the jail grew full of bowel contents. He reports having to "beg" for a new colostomy bag and only receiving one after 4-5 days of sitting in intake.

138. Another class representative spent two weeks sitting in a plastic chair in the intake area. He suffers from diabetes. During this time, his feet began to swell from sitting for so long. He reports that the intake area was filthy, hot, and stinky.

139. Class representatives report not being able to sleep while waiting in intake. They report not being permitted to lie down on the floor or having any flat surface on which to rest. They report that people who tried to lie down on the floor would be woken up by SCSO staff and sometimes sprayed with pepper spray.

140. Holding a legally innocent person upright in a plastic chair for days on end, in 85-degree heat, under lights that never go off, without a bed, without adequate access to hygiene, and without an assigned housing unit, bears no reasonable relationship to any legitimate governmental objective.

## V. <u>"They'd Leave Us in Here to Die": Fire and Life Safety.</u>

### *A. The regulatory framework.*

141. Correctional facilities are classified in the building and fire codes as "Institutional" occupancies. The defining characteristic of an institutional occupancy is that it is occupied by individuals who are incapable of self-preservation. The people inside cannot leave when there is a fire; the building itself must therefore provide the life-safety features that permit a "defend in place" strategy, and each component of that system—detection, alarm, notification, compartmentation, suppression, egress, and staff response—must function as part of a coordinated whole. NFPA 101: Life Safety Code, ch. 23 (Existing Detention and Correctional Occupancies).

142. Tennessee's minimum standards for local correctional facilities require, among other things, a secure control center staffed twenty-four hours per day that monitors the operation of the fire alarm and smoke and thermal detection systems, Tenn. Comp. R. & Regs. 1400-1-.04(17); an emergency power source of sufficient capacity to operate security and evacuation electrical devices and equipment, id. 1400-1-.04(19); exit signs at each exit, distinctly marked and continuously illuminated, with exits kept clear and in usable condition to ensure the timely evacuation of inmates and staff in the event of fire or other emergency, id. 1400-1-.04(21); the storage of flammable substances in a locked, secure area located outside the security perimeter of the confinement area, id. 1400-1-.07(11); a facility preventative maintenance and repair program, id. 1400-1-.05(9); and that all equipment be in working order, with safety and security equipment repaired or replaced without undue delay, id. 1400-1-.05(10).

143. The ACA's Adult Local Detention Facility Standards require conformity with applicable fire safety codes and a fire alarm and automatic detection system approved by the authority having jurisdiction, ACA Standard 5-ALDF-1C-07; exits properly positioned, clear from obstruction, and distinctly and permanently marked to ensure timely evacuation, with two exits from all housing areas and places of assembly for fifty or more persons, id. 5-ALDF-1C-04; a means for the immediate release of people from locked areas in an emergency, with a back-up system, id. 5-ALDF-1C-03; and a preventive maintenance plan providing for emergency repairs or replacement in life-threatening situations, id. 5-ALDF-1C-13.

*B. The fire alarm and detection system.*

144. The fire annunciator panel at 201 Poplar has been the subject of adverse TCI findings for at least eight years. In February 2018, the panel was displaying 475 trouble codes. In

October 2019, it displayed numerous codes. In November 2019, fire panel repairs remained pending.

145. In its July 2025 inspection, TCI noted that the fire panel had been serviced on March 14, 2025 by Siemens and that the parties were "in the planning stages of updating the system," with meetings occurring every two weeks.

146. In its June 2026 inspection, TCI cited the Jail as deficient under Tenn. Comp. R. & Regs. 1400-1-.05(10) because the fire alarm, panel, and detection system was still being upgraded and replaced. TCI recorded that staff were documenting regular fire watches in the facility and that maintenance and administration were coordinating the replacement with Siemens Industry and the Fire Marshal's office.

147. A fire watch is a stopgap. It is the measure a facility adopts when its detection and alarm systems cannot be relied upon to detect and announce a fire. It substitutes a human being walking a floor for an engineered system designed to detect smoke in every space simultaneously and to notify every occupant and the fire department at once. In a three-story-plus facility housing approximately 2,800 people behind locked steel doors, with limited and frequently inoperable elevators and escalators, a fire watch cannot perform that function.

148. On June 12, 2026, Bonner told Defendants that the fire alarm panel "has been an on-going issue for TCI"; that the Mayor's Administration is responsible for repairing the panel and that Support Services must make the corrections and repairs; that repairs or, ideally, new panels are needed so that they properly connect to the Fire Department; and—in bright red, bold typeface in the original—that **"[t]he Mayor's Administration has until August 10, 2026 to make the repairs or face consequences with regard to my ability to continue housing residents in the Jail."**

149. On July 8, 2026, Chief Jailer Fields confirmed that the fire alarm system had not been functioning for the prior month "when the diesel fuel was flooding." He further confirmed that the fire alarm system was in the process of being repaired but did not detail what repairs were needed or how long they would take.

150. On August 14, 2026, TCI re-inspected the Jail and again found that the Jail did not meet minimum standards. In the comments to the inspection report, TCI noted the Jail "made significant progress with their smoke detection equipment," but the Jail is not "scheduled to complete the full project [until] the end of the year." It will be months, therefore, until the Jail has a fully functional fire alarm system.

151. A fire alarm system in a building of this kind must do more than sound an alarm. It must signal the building's HVAC system to shut down. National Fire Protection Association codes require duct smoke detectors for that purpose, so that the air handling system does not distribute smoke throughout the building during a fire. An HVAC system that continues to run during a fire becomes a mechanism for moving smoke into occupied spaces.

152. Upon information and belief, the air handling system at 201 Poplar is not equipped with duct smoke detectors capable of shutting the system down upon detection of smoke.

153. That failure compounds the alarm failure and the architecture of the building. Four hundred beds at 201 Poplar are located in housing units with no exterior openings at all. In a windowless housing unit there is no way to ventilate smoke horizontally, and the people inside cannot leave. An air handling system that continues to run during a fire will distribute smoke into precisely those spaces.

*C. The diesel fuel leak.*

[11]

154. On a date shortly before June 12, 2026, the emergency generator located on the roof of the Annex leaked diesel fuel into the Jail's kitchen.

155. Bonner described the fuel as having "gushed," and reported that it poured into the electrical room and flowed near areas where people are housed. He attached videos of the event to his memorandum to Defendants.

156. At the time of the leak, the fire alarms were not working.

157. Then-Sheriff Bonner told Defendants to "imagine what would have happened if a fire had started and the fire alarms were not working." He described the fuel in the kitchen as "extremely dangerous," noted that at least some workers could have been removed and staff would have behaved responsibly, and stated that his office "could only imagine the result if that had happened."

158. Then-Sheriff Bonner further reported that Support Services' contractor repairs to the emergency generator fuel line "did not hold and it happened again." His office was not supported in the cleanup and remedial efforts and had to seek and pay a professional company to remove the fuel.

[11] FOX13 Memphis News Staff, *Video shows diesel fuel leaking inside 201 Poplar Jail*, FOX13 Memphis, Jul. 7, 2026, https://www.fox13memphis.com/news/video-shows-diesel-fuel-leaking-inside-201-poplar-jail/article_ca6feb5c-c480-40e9-a4de-2521f3373ba7.html.com.

*D. Egress, doors, and locks.*

159. The Needs Assessment documented obstructed egress at 201 Poplar: "[e]gress pathways were obstructed by tables, posing a serious violation of safety regulations by impeding potential evacuation routes during emergencies."

160. The Needs Assessment documented cell egress widths as narrow as 24 inches in some housing units, the product of poor design creating narrow passageways to access cells.

[12]

161. The Needs Assessment documented cell door malfunctions: on the third floor, cell doors numbered 4, 5, 15, and 16 were off track, with people housed in cells 15 and 16 at the time.

[12] Picture showing narrow egress. **Exhibit 2**, 2025 Needs Assessment, pg. 115.



[13]

162. The Needs Assessment documented that the crash gate in one pod was stuck and required a person incarcerated at the Jail to force it open and identified this as a concern for emergency response capabilities.

163. The Needs Assessment also found that SCSO staff rely primarily on keys to enter units, that "waiting multiple minutes for access was common," that the available access control system was antiquated and not fully working, and that "[i]t is extremely rare that facilities rely on keys and exchange keys at the level witnessed." The Needs Assessment found the locking system, doors, and wall structures "so obsolete that obtaining parts for repair requires specialized orders or fabrication," delaying repair and maintenance.

164. TCI's July 2025 inspection recorded inoperable doors among its concerns. TCI's June 2026 inspection recorded that "the installation of new doors throughout the facility is nearing completion."

[13] Picture showing occupied cell door off its track. **Exhibit 2**, 2025 Needs Assessment, pg. 116.

165. The Needs Assessment documented light fixtures covered with paper, which he identified as "a fire hazard," and exposed conduit with damaged outlets "pervasive throughout" the fifth floor. TCI documented exposed wiring in June 2026. An uncovered electrical outlet was observed within a Lower Level pod.

[14]

[14] Picture showing exposed electrical outlet. **Exhibit 2**, 2025 Needs Assessment, pg. 116.


[15]


[16]

166. Elevators are inadequate to move the nearly 3,000 detainees, staff, volunteers, and contractors in the building, along with supplies, food, equipment, and emergency response, and "they frequently break down," according to the Needs Assessment.

[15] Picture showing exposed electrical outlet. **Exhibit 2**, 2025 Needs Assessment, pg. 129.
[16] Picture showing exposed electrical outlet. **Exhibit 2**, 2025 Needs Assessment, pg. 129.

167. The escalators, in continuous operation since 1981, are worn out, narrow, require single-file movement, and frequently out of service. Their narrowness would make it difficult for people to move side-by-side in the event of an emergency.


[17]

168. According to the Needs Assessment, "In a non-functional state as many of the escalators are today, an inmate, staff member, volunteer, or contract worker could surface a complaint regarding accessibility under the Americans with Disabilities Act if access to the elevators were also an issue."

169. The Needs Assessment further concluded that on inoperable escalators the first three risers are only a few inches tall, creating trip hazards.

170. Escalator outages and limited elevators delay medical response times to emergencies.

[17] Picture of escalators. **Exhibit 2**, 2025 Needs Assessment, pg. 123.

171. Chief Fields acknowledged at the July 8 press conference in response to a question about emergency evacuation in the event of a fire that the Jail's emergency evacuation plans are "very limited" given the size of the Jail's population.

*E. Class representatives' reports on fire and life safety.*

172. Most class representatives report that despite having been detained at the Jail for years, they have not participated in a fire drill, nor have they been informed about an evacuation plan. One class representative reports that in the seven years he has been in the Jail, he has participated in one fire drill where his pod was taken to the roof of the Jail.

173. Class representatives report that cell doors frequently malfunction and that there are no emergency call buttons inside their cells to alert jail staff. They resort to kicking the doors loudly with their legs in order to get a sheriff's officer's attention.

174. Class representatives report that there is only one set of keys to manually open cell doors per floor. If a fire were to break out and disable the electrical panel, a single officer would need to use one set of keys to open every cell door in every pod. This would take several minutes.

175. Class representatives report that detainees frequently light fires in their cells to smoke drugs, cook food, and get the attention of a guard. Class representatives report that fires are lit by placing rolled up toilet paper into an open electrical socket. Class representatives report that long strands of toilet paper ("wicks") will be kept lit on fire for hours, or even days, so as to allow frequent access to fire.

176. Class representatives report that many Jail uniforms have small brown burn marks on them from people smoking and accidentally singeing their uniform.

177. Class representatives who cannot walk or have difficulty walking fear that they would not be able to evacuate the Jail if there were a fire. They depend on the elevator to move

around the jail. If the elevator were to stop working during a fire, they would not be able to leave the jail.

178. Class representatives fear that if there was a fire, Jail staff would leave them in their cells to die by smoke inhalation or fire.

## VI. Water, Sanitation, Sewage, Mold, and Pests.

### *A. Sewage.*

179. Sewage flows out of 201 Poplar through grinders. On or about the week of June 8, 2026, the grinder pit alarm sounded because of high water. Sheriff's Office staff asked Support Services to blow out the system and clear the line.

180. That did not happen in time. The water at 201 Poplar had to be shut off for approximately eight hours over the weekend to clear the line.

181. Bonner advised Defendants that raw sewage is a health issue for obvious reasons, and that given the population at 201 Poplar, sewage "can carry HIV and Hepatitis, among other communicable diseases putting everyone in the facility at risk."

182. Tennessee law requires that the county jail "have sufficient sewerage to ensure the health and comfort of the inmates." Tenn. Code Ann. § 5-7-110(b). Tennessee's minimum standards require operable floor drains in all kitchens, dining rooms, multiple toilet areas, and corridors. Tenn. Comp. R. & Regs. 1400-1-.04(23).

### *B. Standing water and drainage.*

183. The Needs Assessment found that "[p]ooling of water was prevalent in most wet areas with many drains being clogged or drain covers being compromised," and that the fifth and sixth floors "have significant problems with pooling and poor drainage."

184. On the Lower Level, the Needs Assessment found that people incarcerated at the Jail "have resorted to placing towels on the shower floors to prevent water from flooding into the hallways," which he identified as indicative of plumbing problems requiring rectification.


[18]

185. On the third floor, the Needs Assessment found "numerous water leaks observed throughout," and warned that persistent leaks can cause structural damage over time and may lead to mold growth.

186. The Needs Assessment found ceiling tiles were missing in most pods and documented water damaged ceiling tiles.

[18] Picture showing wet towels on cell floor. **Exhibit 2**, 2025 Needs Assessment, pg. 118.


[19]

187. The Needs Assessment found the aging of water and sewer lines evidenced by rusting and water leaks, and reported that maintenance staff described replacing 100 feet of cast iron piping in the building each month.

[19] Picture of missing ceiling tiles. **Exhibit 2**, 2025 Needs Assessment, pg. 130.




[20]



[21]

[20] Picture of rusted water pipe. **Exhibit 2**, 2025 Needs Assessment, pg. 128.
[21] Picture of rusted water pipes. **Exhibit 2**, 2025 Needs Assessment, pg. 134.



[22]

*C. Mold.*

188. The Needs Assessment documented "an alarming level of mold growth observed in the shower areas and on the ceiling," and found that this "poses serious health risks as mold can lead to respiratory problems and other illnesses." Later in the report, the Assessment again noted, "There is excessive mold throughout the [Jail]."

[22] Picture of pooling water. **Exhibit 2**, 2025 Needs Assessment, pg. 134.


[23]

189. TCI has documented mildew throughout 201 Poplar in its repeat findings across inspection years.

190. SCSO staff reported to Defendants in June 2026 that mold toxicity occurs when prolonged exposure to indoor mold triggers systemic inflammation and immune response, that the odor in the Jail was atrocious, and that condensation had intensified as the temperature rose.

[23] Picture showing mold on ceiling. **Exhibit 2**, 2025 Needs Assessment, pg. 135.

191. The heat, poor ventilation, water, and mold are not separate problems. The failure of the chillers and the absence of ventilation raise humidity and produce the condensation on which mold grows, and the same failure prevents the building from drying.

*D. Pests.*

192. TCI cited the Jail as deficient in July 2025 under Tenn. Comp. R. & Regs. 1400-1-.09(5) because "[p]ests were present in multiple inmate housing areas."

193. TCI documented pests and vermin at 201 Poplar in October 2019 as well.

*E. Sanitation, maintenance, and hygiene.*

194. TCI cited the Jail in July 2025 under Tenn. Comp. R. & Regs. 1400-1-.09(7) because showers needed cleaning in several areas of inmate housing, and under 1400-1-.09(2) because multiple light fixtures were missing from inmate housing, cracked or shattered windows and missing or broken ceiling tiles were present in inmate housing, and return vents needed cleaning.

195. TCI cited the Jail again in June 2026 under Tenn. Comp. R. & Regs. 1400-1-.09(2) because multiple light fixtures were cracked, cracked windows and missing or broken ceiling tiles were present in inmate housing, and beds, baseboards, and showers were rusted in multiple housing units.

196. TCI cited the Jail in both July 2025 and June 2026 under Tenn. Comp. R. & Regs. 1400-1-.04(7) for failure to meet the required ratio of showers and sinks (and, in 2025, toilets) to population in multiple housing units.

197. The Needs Assessment noted "water leaks, non-functioning toilets, showers constantly running" throughout the Jail.

[24]

198. The Needs Assessment also documented corrosion and deterioration throughout the facility.

[24] Picture of shower with mold and water corrosion. **Exhibit 2**, 2025 Needs Assessment, pg. 115.



25



26

[25] Picture of bathroom with mold and water corrosion. **Exhibit 2**, 2025 Needs Assessment, pg. 127.
[26] Picture of wall with water corrosion. **Exhibit 2**, 2025 Needs Assessment, pg. 127.

*F. Class representatives' experience with sewage, water, sanitation, pests, and mold.*

199. Class representatives report that the water the comes out of the sinks in their cells is brown or rust colored. It is especially brown if the water has been shut off for a while. One class representative who bathes with a washcloth reports that the cloth has turned brown because of the water. Many class representatives do not feel safe drinking the water from the sinks in their cells.

200. Class representatives report frequent flooding of water and sewage in their cells. One class representative reports that so much sewage and feces flooded into his cell he saw kernels of corn lodged in feces floating in the liquid in his cell. The sewage overflows from the toilets, the drains in the floor, or can flood into the cell from the area behind the cell called the catwalk.

201. Class representatives report mold on their toilets, bunks, and showers. One class representative reports that the Jail recently painted the floor of the shower in his unit black so that the mold would be less visible. Class representatives report that the showers smell like mildew.

202. Class representatives report seeing cockroaches every day. They also report seeing mice, rats, gnats, head lice, and bed bugs. Class representatives report waking up to find bugs crawling on them.

## VII. <u>Lack of Access to Natural Light and Recreation.</u>

203. Four hundred beds at 201 Poplar have no access to natural light at all. Lower Level South contains 322 beds across seven pods, A through G. Lower Level North contains 78 beds across four pods, H, J, K, and M. Every bed in both areas is in a unit without access to natural light.

204. Additional housing units at 201 Poplar have no access to natural light, including H Pod and S Pod on the third floor; H Pod, J Pod, and S Pod on the fourth floor; and the JM pods located in the second-floor medical and mental health area.



[27]

205. The people confined in these units are, by the Jail's own classification, among those least able to advocate for themselves: people with behavioral, suicidal, and acute physical and mental health classifications.

206. The Needs Assessment found that "[n]one of these housing areas meet state or national standards regarding square feet, day room space, or access to natural light," and recorded against ACA Standard 5-ALDF-1A-14 that "[t]here is no access to natural light in LL housing areas or in the housing pods on each end of the 2nd and 3rd floors."

207. The Needs Assessment also found that the JMH unit within the medical clinic "does not comply with state jail standards due to no access to natural light," and that cell JMG has a

[27] Picture showing medical unit with no natural light. **Exhibit 2**, 2025 Needs Assessment, pg. 120.

shower that is not ADA compliant. Housing unit F within the clinic is a converted staff breakroom that still contains counters and cabinets.

208. The Needs Assessment recommended that the County "[i]mmediately stop using the lower-level housing areas" and "[s]top the practice of housing inmates in the current clinic area as these areas do not meet minimum correctional standards." Defendants did neither.

209. The Needs Assessment also found that the Jail's outdoor and indoor recreation areas are largely unused—in violation of American Correctional Association standard 5-ALDF-5C-01. This standard requires an hour of physical exercise outside the cell. According to the Assessment, due to overcrowding, the indoor recreation areas are used for housing. And, "due to critical staff shortages, the movement of inmates from housing floors to the recreation area is extremely difficult."

210. The Needs Assessment also reported the utilization of a black, metal cage for "out of cell time" for "acute special needs inmates."


[28]

211. Class representatives housed in the medical units of the second-floor report not having access to natural light. They report that several mentally ill people who throw urine and feces are put in the black cage on the second floor and sometimes pepper sprayed for their behavior.

212. Other class representatives report having gone months, and in some cases years, in custody without having seen the sun or sky or being taken outside for recreation.

## VIII. <u>Defendants' Knowledge and Their Failure to Act.</u>

213. Defendants have actual knowledge of every condition alleged in this Complaint. Most of the conditions alleged were reported by Defendants themselves or experts hired by Defendants.

*A. Decades of federal oversight.*

[28] Picture of black metal cage used for acute special needs detainees. **Exhibit 2**, 2025 Needs Assessment, pg. 124.

214. As Bonner wrote to Defendants on June 12, 2026, under the heading "Shameful History is Repeating," in 1975, the "old" Jail was governed by a federal consent decree requiring the Sheriff and the Shelby County Quarterly Court—the predecessor to the Board of Commissioners—to provide adequate air circulation in the jail. During a 1980 heat wave, a medically fragile resident died of heat stroke when the Jail's temperature was 96 degrees.

215. In *Little v. Shelby County*, No. 2:96-cv-02520 (W.D. Tenn. 1996), this Court entered an injunction and successive consent decrees addressing violence, overcrowding, classification, and supervision at 201 Poplar; appointed a Special Master; and held Defendants in contempt in December 2000. The case was not dismissed until 2005, after a fourteen-point remedial plan was implemented.

216. In 2000, the Civil Rights Division of the United States Department of Justice opened an investigation of 201 Poplar under the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997 et seq. Its findings letter, issued in 2001, addressed inadequate supervision leading to excessive levels of violence, inadequate medical and mental health care, and deficient sanitation. The United States filed suit and a settlement agreement on August 12, 2002. *United States v. Shelby County*, No. 2:02-cv-02633 (W.D. Tenn. 2002).

217. In 2020, pretrial detainees at 201 Poplar brought a class action against then-Sheriff Bonner and the Shelby County Sheriff's Office challenging conditions that placed medically vulnerable people at risk during the COVID-19 pandemic. *Busby v. Bonner*, No. 2:20-cv-02359 (W.D. Tenn. 2020). That action resulted in the certification of classes, the appointment of an independent inspector who toured the Jail and reported to the Court, and a consent decree. The independent inspector's reports repeatedly found the facility understaffed.

218. In *Turnage v. Oldham*, No. 2:16-cv-02907 (W.D. Tenn. 2016), a class of people over-detained at the Jail obtained relief arising from the County's failure to release people entitled to release.

*B. Nine consecutive years of state inspection findings.*

219. The Tennessee Corrections Institute ("TCI") is the state agency charged with establishing and enforcing minimum standards for local correctional facilities. Tenn. Code Ann. § 41-4-140; Tenn. Comp. R. & Regs. 1400-1-.01 et seq. It inspects 201 Poplar annually.

220. A review of TCI's annual inspections of 201 Poplar from 2017 through 2024 reflects the same findings, repeated year after year: noticeable physical plant deterioration; antiquated doors, locks, and security devices; problematic electrical, plumbing, and climate control systems; fire annunciator trouble codes; water leaks; periodic crowding; leaks, rust, and mildew throughout the facility; inoperable escalators; and difficulty managing multiple housing units with existing staff numbers.

221. TCI notified then-Sheriff Bonner in writing, with a copy to Mayor Harris, that 201 Poplar does not meet all applicable minimum standards, in each of at least 2018, 2019, 2022, 2024, 2025, and 2026. TCI's final reports are presented to its Board of Control. **Exhibit 6**, TCI Reports; **Exhibit 2**, 2025 Needs Assessment.

222. In February 2018, TCI found that the Jail did not meet all applicable minimum standards and required reinspection. Electrical, plumbing, and climate control systems were identified for extensive repair or replacement. The fire annunciator panel was displaying 475 trouble codes. Multiple showers required immediate repair, and the roof was leaking in all housing units on the sixth floor and in the gymnasium.

223. In October 2019, TCI again found the Jail noncompliant. Physical plant deterioration had worsened since 2018. The fire panel displayed numerous trouble codes. Staffing levels were low, with 152 vacancies. Walls, ceilings, and doors were in disrepair. Pests and vermin were present.

224. In October 2024, TCI again required reinspection. Lighting did not meet standards. Multiple housing areas lacked adequate space and fixture ratios. Numerous light fixtures were broken or missing. Windows and ceiling tiles were damaged. Security checks did not meet requirements. The facility failed to meet classification standards in several housing units. The count during that inspection was 2,843 people at 201 Poplar (the Jail is only approved by TCI for 2,471 beds).

225. In July 2025, TCI conducted its annual inspection and identified thirteen deficient items. The overall result was "non-compliant." The deficiencies included: lighting in multiple housing areas below standard; failure to meet square-footage requirements in multiple housing areas; failure to meet the required ratio for showers, toilets, and sinks in multiple housing units; missing light fixtures, cracked or shattered windows, and missing or broken ceiling tiles in inmate housing, with return vents needing cleaning; pests present in multiple inmate housing areas; showers needing cleaning in several areas of inmate housing; refrigerators below standard; and security checks and special observation checks inconsistent in meeting time parameters.

226. TCI's narrative comment on that inspection was unambiguous: the facility's condition continues to decline due to its age and overcrowding; the current design of the Jail does not align with modern penological standards; notable concerns include broken windows, exposed wires, inoperable doors, and multiple cells out of service, which have reduced available bed space;

overcrowding persists in several housing areas; and low staffing levels are compounding the operational challenges.

227. On July 17, 2025, TCI Executive Director William Wall notified Sheriff Bonner via letter that the facility did not meet all applicable minimum standards and that a reinspection would occur on or about September 11, 2025. Mayor Lee Harris was copied on that letter. **Exhibit 7**, Shelby Co. CJC Inspection.

228. TCI conducted its next annual inspection from June 9 through June 11, 2026, arriving unannounced. It identified five deficient items. The overall result was again "non-compliant."

229. The June 2026 deficiencies were: lighting in multiple housing areas below standard, Tenn. Comp. R. & Regs. 1400-1-.04(2); failure to meet square-footage requirements in multiple housing areas, id. 1400-1-.04(3); failure to meet the required ratio for showers and sinks in multiple housing areas, id. 1400-1-.04(7); failure to keep all equipment in working order because the fire alarm, panel, and detection system remained in the process of being upgraded and replaced, id. 1400-1-.05(10); and cracked light fixtures, cracked windows, missing or broken ceiling tiles, and rusted beds, baseboards, and showers in multiple housing units, id. 1400-1-.09(2).

230. TCI's narrative comment in June 2026 repeated the prior year's findings and added to them: the condition of the facility continues to deteriorate, primarily due to its age and ongoing overcrowding; the Jail's current layout and design no longer meet contemporary penological standards; key areas of concern include broken windows, exposed wiring, and rust buildup on beds, toilets, and showers; and overcrowding remains an issue in several inmate housing units.

231. By letter dated June 15, 2026, TCI notified Sheriff Bonner that the facility did not meet all applicable minimum standards and that a reinspection would be conducted on or about August 10, 2026. Mayor Harris was again copied.

*C. The Needs Assessment.*

232. On August 14, 2026, TCI re-inspected the Jail and again found that the Jail did not meet minimum standards regarding its the physical plant (natural light, square footage) and sanitation/maintenance (cracked windows, missing ceiling tiles, exposed wiring, rust in housing units). In a cover letter to former Sheriff Bonner, former Mayor Lee Harris, and current Chief Jailer Kirk Fields, TCI recommended that the Jail submit a "formal Plan of Action" to the TCI Board of Control on September 2, 2026, so that TCI could consider granting certification to the Jail. As of the filing of this Complaint, it is unclear whether the Jail submitted a plan of action and whether the Jail was certified by the TCI Board of Control.

233. On May 16, 2024, then-Sheriff Bonner requested that the University of Tennessee's County Technical Assistance Service ("CTAS") prepare a master plan for the Shelby County Jail. Jail management consultant Jim Hart conducted the assessment over multiple site visits in 2024 and January 2025 and delivered the 2025 Shelby County Jail Needs Assessment on May 27, 2025. **Exhibit 2**, 2025 Needs Assessment.

234. The Needs Assessment found "significant building deterioration" at 201 Poplar, attributable in part to "a history of inadequate funding to support preventive maintenance, major capital improvements, and a full complement of specialized maintenance persons," with the result that the Sheriff's Office has had to rely on outside contractors to keep the building functioning.

235. Between January and August 2024, the Jail's maintenance team received an average of 1,037 work orders each month. It completed an average of 957. The consultant observed

that the maintenance team "is struggling to keep up with the volume of work orders created because of aging physical plants."

236. The Needs Assessment recommended, among other things, that the County conduct a detailed mechanical, engineering, electrical, and structural assessment of 201 Poplar; ensure adequate funding for preventive maintenance, major capital improvements, and specialized maintenance personnel; provide ongoing funding for the physical plant; expand and reconfigure the booking and release area; stop housing people in the current clinic area; return to direct-supervision staffing; and "[i]mmediately stop using the lower-level housing areas," which "do not meet Tennessee's Minimum Standards for Local Correctional Facilities or the American Correctional Association's Adult Local Detention Facility Standards, Fifth Edition."

237. Defendants did not stop using the lower-level housing areas. Upon information and belief, they remain in continuous use as restricted housing as of the filing of this Complaint.

*D. Notice from Sheriff and Staff.*

238. SCSO jail staff wrote to Mayor Harris and to all thirteen Commissioners by name in June 2026 to report inhumane and cruel conditions and to request immediate assistance.

239. Bonner wrote to Mayor Harris and the Board of Commissioners on June 12, 2026, under a caption identifying the issues as life-threatening, and copied the Shelby County CAO, the County Attorney and two Deputy County Attorneys, the Lead Judicial Commissioner, the Criminal Court and General Sessions Criminal Court Administrative Judges, the General Sessions Court Clerk, and five Board of Commissioners Legislative Specialists.

240. In that memorandum, Bonner told Defendants that the facility is crumbling and that they know it; that the County houses a growing, aging, and medically fragile population that must be protected; that critical repairs are delayed while plans for a new jail are constantly postponed;

and that "[i]t is inexcusable that we are taking risks with fire safety, temperature controls, leaking diesel fuel, sewage, and air flow."

241. Chief Jail Kirk Fields again confirmed the dangerously high temperatures, heat-related illnesses, inoperable fire alarm system, and the need for repairs to the Jail publicly on July 8, 2026. He was joined by current Commissioner Mark Billingsley. Billingsley described the Jail as having "no air, standing water, and black mold." To Billingsley, the Jail is the "responsibility of the Shelby County Commissioners and the Shelby County Mayor." But, given the Jail's dire conditions, Billingsley concluded, "I think it has risen to a point of federal intervention."

242. On July 10, 2026, another County Commissioner, Charlie Caswell, sent a letter to then-Sheriff Bonner and then-Mayor Lee Harris raising "significant maintenance and infrastructure concerns within the Shelby County Jail." In his words, the conditions of the Jail "appear to present serious operation, safety, and financial risks if they are not addressed in a timely manner." **Exhibit 8**, Caswell Letter.

*E. Stop-gap repairs and further delays.*

243. On August 10, 2026, the Shelby County Board of Commissioners adopted a resolution allocating up to $350,000 in County contingency funds to request proposals to conduct another professional study of 201 Poplar and the Jail East building, following the recommendation of the "Justice Center Ad Hoc Committee." The resolution does not set any deadlines for proposals to conduct the study or for the study itself. It does not commit the County to conducting a study or commit the County to acting on any study's recommendations.

244. On August 24, 2026, the Commission took up a resolution to approve "temporary Chiller Services" at the Annex, where none of the Class representatives are housed.

245. In sum, notwithstanding ample, public notice, the conditions alleged in this Complaint persist. Defendants' responses have been partial, temporary, or deferred: rented chillers, portable units, fans, water coolers, a fire watch in place of a working fire alarm system, and repairs that do not hold.

246. Defendants' failure to remedy these conditions is not the product of any legitimate governmental objective. They have been on notice for years regarding the aging, overcrowded and dangerous conditions of the Jail and have failed to remedy them.

247. Each of the conditions alleged herein is ongoing as of the filing of this Complaint and will continue absent an order of this Court.

## CLASS ACTION ALLEGATIONS

248. Plaintiffs bring this action on behalf of themselves and, pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure, on behalf of the following Class and Subclasses.

249. The Class is defined as: all persons who are now, or will in the future be, confined at the Shelby County Criminal Justice Center at 201 Poplar Avenue, Memphis, Tennessee.

250. The Post-Conviction Subclass is defined as: all members of the Class who have been convicted of a crime and are detained at 201 Poplar. Plaintiff Enoch Zarceno-Turner represents this Subclass.

251. The Restricted Housing Subclass is defined as: all members of the Class who are now, or will in the future be, housed in a cell or unit at 201 Poplar that has no access to natural light, including second-floor medical units. Plaintiff Eric Wallace represents this Subclass.

252. The Disability Subclass is defined as: all members of the Class who have a disability within the meaning of 42 U.S.C. § 12102 and 29 U.S.C. § 705(20)(B), including without limitation persons whose disabilities impair thermoregulation, mobility, or the ability to evacuate

independently in an emergency. Plaintiffs Thaddeus Norris, Eric Wallace, and Vintrell White represent this Subclass.

253. **Numerosity**. The Class satisfies Fed. R. Civ. P. 23(a)(1). As of July 2026, 2,800 people were confined at 201 Poplar, with an average daily population of 2,716. The Class also includes future members, whose identities cannot be known. Joinder of all members is impracticable both because of the number of members and because Class members are incarcerated, with correspondingly limited ability to institute individual actions.

254. **Commonality**. The Class satisfies Fed. R. Civ. P. 23(a)(2). Common questions of law and fact include: whether Defendants subject Class members to temperatures, poor ventilation, and humidity that pose a substantial risk of serious harm; whether Defendants maintain a fire alarm, detection, and evacuation system adequate to protect Class members; whether Defendants subject Class members to prolonged intake detention without a bed, adequate personal space, adequate hygiene, or ability to sleep; whether Defendants subject Class members to unsanitary conditions including standing water, sewage backups, mold, and pests; whether Defendants confine Class members for extended periods without access to natural light and recreation; whether these conditions are reasonably related to a legitimate governmental objective; whether Defendants have been aware of and disregarded these conditions; and whether Defendants' policies, customs, and practices cause these conditions.

255. **Typicality.** The Class satisfies Fed. R. Civ. P. 23(a)(3). Named Plaintiffs' claims arise from the same conditions, policies, customs, and practices, and rest on the same legal theories, as those of the Class.

256. **Adequacy.** The Class satisfies Fed. R. Civ. P. 23(a)(4). Named Plaintiffs have no interests adverse to those of the Class and will fairly and adequately protect the Class's interests.

Counsel for Named Plaintiffs are experienced in civil rights class action litigation, including prior conditions-of-confinement class litigation against this facility, and know of no conflicts among Class members or between counsel and Class members.

257. Rule 23(b)(2). Defendants have acted and refused to act on grounds generally applicable to the Class and Subclasses, making final declaratory and injunctive relief appropriate respecting the Class and Subclasses as a whole. Plaintiffs seek no damages.

258. Because Class members' confinement at 201 Poplar is inherently transitory, the claims of the Class are capable of repetition yet evading review, and relation back is appropriate as to any Named Plaintiff whose individual claim becomes moot. *Gerstein v. Pugh*, 420 U.S. 103, 110 n.11 (1975).

**CLAIMS FOR RELIEF**

*Legal Standards Applicable to Counts I Through VI*

259. Plaintiffs repeat and reallege each preceding paragraph as if fully set forth herein.

260. Pretrial detainees may not be punished. *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). A condition of confinement amounts to punishment where it is not reasonably related to a legitimate governmental objective, or where it is arbitrary or purposeless, or where it is excessive in relation to the objective it purportedly serves. *Id*. at 538–39.

261. For sentenced prisoners, the Eighth Amendment prohibits conditions that deny the minimal civilized measure of life's necessities, *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981), imposed with deliberate indifference, *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

262. Both pretrial detainees and sentenced prisoners must show that the defendant acted with deliberate indifference to the conditions of their confinement, which requires proof of both an objective and a subjective component. *Comstock v. McCrary*, 273 F.3d 693, 702–03 (6th Cir.

2001) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)); *accord Poynter v. Shirley*, No. 25-5188, slip op. at 14, 29 (6th Cir. Sept. 8, 2026) (en banc).

263. The Constitution protects against sufficiently imminent future harm as well as present injury. *Helling v. McKinney*, 509 U.S. 25, 33–35 (1993) ("[i]t would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them") (quoting *Hutto v. Finney*, 437 U.S. 678, 682 (1978)).

264. Conditions must be evaluated in combination where they have a mutually enforcing effect that produces the deprivation of a single identifiable human need. *Wilson v. Seiter*, 501 U.S. 294, 304–05 (1991); *Walker v. Mintzes*, 771 F.2d 920, 925–28 (6th Cir. 1985).

265. Conditions tolerable for a short period become unconstitutional when prolonged. *Spencer v. Bouchard*, 449 F.3d 721, 728–29 (6th Cir. 2006); *see Braswell v. Corrections Corp. of America*, 419 F. App'x 622, 627 (6th Cir. 2011).

**COUNT I**
**42 U.S.C. § 1983; Fourteenth and Eighth Amendments**
*Excessive Heat, Humidity, and Failed Ventilation*
(All Classes against all Defendants)

266. Plaintiffs repeat and reallege each preceding paragraph.

267. Defendants confine Class members in housing units in which temperatures regularly exceed 80 degrees, have been recorded between 88 and 95 degrees, and have been accompanied by humidity reported by the Sheriff's own staff at 100 percent, and in which some areas have no functioning ventilation at all.

268. Exposure to these conditions poses a substantial risk of serious harm, including heat exhaustion, heat stroke, permanent neurological injury, exacerbation of cardiovascular, pulmonary, renal, and psychiatric conditions, and death. That risk is heightened for the substantial

portion of the Class taking medications that impair thermoregulation and for the substantial portion with underlying medical conditions.

269. Defendants separately fail to provide Class members with adequate ventilation. A substantial fraction of the Jail's air handling units do not deliver the minimum outdoor airflow required by applicable standards; most of the Jail's air systems are at or beyond the end of their service life and predate modern ventilation controls; and the solid cell doors Defendants installed have sealed the cells off from what conditioned air the dayrooms receive, leaving cells without supply air and materially hotter and with poorer quality air than the common areas.

270. Inadequate ventilation is a distinct deprivation from inadequate cooling, and it produces distinct harms: the accumulation of undiluted airborne pollutants, elevated rates of transmission of respiratory infection in a congregate setting from which no one may withdraw, and the sustained moisture conditions that generate the mold documented throughout the facility.

271. Class members cannot take any of the ordinary steps a free person takes to avoid heat injury. They cannot leave, cannot control ventilation, cannot open a window, and cannot obtain cool showers, ice, or cold water except as Defendants provide them. A person locked in a sealed cell behind a solid door has no means of self-protection whatsoever.

272. These conditions are not reasonably related to any legitimate governmental objective. There is no penological purpose in a broken chiller.

273. Defendants have known of these conditions and of the risk they pose. TCI identified the Jail's climate control systems for extensive repair or replacement as early as 2018. The Needs Assessment documented extreme warmth, mold, and staff propping open security doors to compensate in 2025. The Sheriff's jail staff reported heat exhaustion symptoms and emergency room transports in June 2026. The Sheriff reported unit-by-unit temperature exceedances, the

failure of four of six chillers, and a prior heat-stroke death in County custody, in writing, on June 12, 2026.

274. Defendants have acted deliberately in the face of that risk. They have furnished fans that blow hot air, rented equipment, and deferred capital repairs, while declining to restore the mechanical systems required to keep the building within the temperature limit the State of Tennessee imposes.

275. Defendants' conduct constitutes punishment of pretrial detainees in violation of the Fourteenth Amendment and, as to sentenced subclass members, cruel and unusual punishment in violation of the Eighth Amendment.

**COUNT II**
**42 U.S.C. § 1983; Fourteenth and Eighth Amendments**
*Unreasonable Risk of Injury or Death by Fire*
(All Classes against all Defendants)

276. Plaintiffs repeat and reallege each preceding paragraph.

277. Class members have a right not to be subjected to the unreasonable threat of injury or death by fire. *Hadix v. Johnson*, 367 F.3d 513, 525–29 (6th Cir. 2004).

278. Class members are incapable of self-preservation in a fire. They are confined behind locked steel doors, in a building whose locks are operated primarily by keys, whose doors have been documented off track, whose crash gates have stuck, whose egress paths have been obstructed, and whose elevators and escalators are frequently out of service.

279. The fire alarm, panel, and detection system at 201 Poplar has not been in working order. TCI cited it as a deficiency in June 2026 and has documented annunciator trouble codes at the facility since at least 2018. Defendants have substituted a human fire watch for a functioning engineered detection and notification system.

280. Diesel fuel from the Annex emergency generator leaked into the Jail's kitchen and electrical room and flowed near occupied housing areas at a time when the fire alarms were not working. Contractor repairs to the fuel line did not hold, and the leak recurred.

281. Class members report constant fire-lighting in the cells using uncovered electrical outlets.

282. Taken together, these conditions pose a substantial risk of serious harm—including death by fire, smoke inhalation, and failed evacuation—to every person confined at 201 Poplar.

283. Defendants have actual knowledge of this risk. TCI has documented it repeatedly and has set a deadline of on or about August 10, 2026 for correction. The Sheriff communicated it to Mayor Harris and the Board of Commissioners in writing on June 12, 2026, in bold typeface, with a warning about his ability to continue housing people at the Jail. The Needs Assessment documented the risks posed by broke elevators and escalators, blocked egrees, and uncovered wires and electrical sockets.

284. Defendants have acted deliberately and recklessly in the face of that risk.

285. Defendants' conduct constitutes punishment of pretrial detainees in violation of the Fourteenth Amendment and, as to sentenced Class members, cruel and unusual punishment in violation of the Eighth Amendment.

**COUNT III**
**42 U.S.C. § 1983; Fourteenth Amendment**
*Prolonged Intake Detention and Overcrowding*
(Class, excluding Post-Conviction Subclass, against all Defendants)

286. Plaintiffs repeat and reallege each preceding paragraph.

287. Defendants hold class members in the open booking area at 201 Poplar for days at a time—as long as nine days in one documented instance, and routinely between one and five

days—without a bed, in a chair, under continuous illumination, in a room measured at 85 degrees, without adequate access to hygiene, and without an assigned housing unit.

288. This detention is not reasonably related to any legitimate governmental objective. It is the product of overcrowding, understaffing, an inadequate physical plant, and administrative delay—including the Mayor's Administration's refusal to authorize the overtime needed to reduce the intake backlog and the once-daily transmission of court judgments—none of which serves any purpose connected to the detention of legally innocent people.

289. It is also excessive in relation to any purpose it might be said to serve. The intake process could be accomplished in hours.

290. Overcrowding at 201 Poplar independently deprives Class members of basic necessities. It causes people to be housed in cells with beds listed out of service, in units that do not meet state square-footage requirements, and without the required ratio of showers, toilets, and sinks; and it curtails recreation, out-of-cell time, and timely security and observation checks.

291. Defendants have known of these conditions since at least 2025, when their own Needs Assessment documented them, and have continued them.

292. Defendants' conduct constitutes punishment in violation of the Fourteenth Amendment.

**COUNT IV**
**42 U.S.C. § 1983; Fourteenth and Eighth Amendments**
*Unsanitary Conditions: Sewage, Standing Water, Mold, and Pests*
(All Classes against all Defendants)

293. Plaintiffs repeat and reallege each preceding paragraph.

294. Defendants confine Class members in a building in which sewage backs up, water pools where drains are clogged or broken, water leaks are pervasive, mold grows visibly in showers

and on ceilings and is described by the County's own Needs Assessment as excessive throughout the facility, and pests are present in multiple housing areas.

295. These conditions pose a substantial risk of serious harm, including exposure to communicable disease—a risk the Sheriff himself identified to Defendants when he warned that raw sewage in this facility can carry HIV and hepatitis—as well as respiratory illness and other harm from prolonged mold exposure.

296. These conditions are mutually reinforcing with the heat conditions alleged in Count I: the loss of cooling and ventilation raises humidity, produces condensation, and prevents the building from drying, accelerating mold growth.

297. These conditions serve no legitimate governmental objective.

298. Defendants have known of them through TCI's annual inspections, through their own Needs Assessment, and through the Sheriff's June 12, 2026 memorandum, and have failed to remedy them.

299. Defendants' conduct constitutes punishment of pretrial detainees in violation of the Fourteenth Amendment and, as to sentenced Class members, cruel and unusual punishment in violation of the Eighth Amendment.

**COUNT V**
**42 U.S.C. § 1983; Fourteenth and Eighth Amendments**
*Prolonged Confinement Without Access to Natural Light and Recreation*
(All Classes and Restricted Housing Subclass, against all Defendants)

300. Plaintiffs repeat and reallege each preceding paragraph.

301. Defendants confine members of the Restricted Housing Subclass in cells and units with no access to natural light whatsoever. Members of the Subclass cannot see the sun, cannot distinguish day from night by natural means, and are exposed to no daylight for the entire period of their confinement in those units.

302. Members of the Subclass are simultaneously deprived of dayroom space, seating, writing surfaces, and adequate square footage, and are subject to restricted-housing conditions and limited out-of-cell time. These deprivations operate in combination.

303. Confining a legally innocent person for extended periods in a windowless cell without a dayroom, seating, or a writing surface is punishment. It bears no reasonable relationship to any legitimate governmental objective, and it is excessive in relation to any objective Defendants might assert.

304. In the alternative, Defendants have acted deliberately and recklessly in the face of a known and obvious risk of serious harm, including sleep disruption, circadian dysregulation, and psychological deterioration.

305. Defendants' own Needs Assessment told them in May 2025 to stop using units without access to natural immediately. They did not.

306. All Class Members have been deprived of recreation.

307. Defendants' conduct violates the Fourteenth Amendment and, as to sentenced Subclass members, the Eighth Amendment.

**COUNT VI**
**42 U.S.C. § 1983; Fourteenth and Eighth Amendments**
*Unconstitutional Conditions in Combination*
(All Classes against all Defendants)

308. Plaintiffs repeat and reallege each preceding paragraph.

309. The conditions alleged in Counts I through V do not operate in isolation. Class members experience them simultaneously and continuously: heat without ventilation, in a building with mold and standing water, without a working fire alarm system, after days spent in a chair in an 85-degree intake room, in units that may have no window at all.

310. These conditions have a mutually enforcing effect and together deprive Class members of identifiable basic human needs, including sleep, sanitation, safety, and adequate shelter.

311. Considered as a whole, the conditions at 201 Poplar deny Class members the minimal civilized measure of life's necessities and constitute punishment of the legally innocent.

**COUNT VII**
**Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act**
(Disability Subclass, against Shelby County)

312. Plaintiffs repeat and reallege each preceding paragraph.

313. Shelby County is a public entity within the meaning of 42 U.S.C. § 12131(1) and receives federal financial assistance within the meaning of 29 U.S.C. § 794(a).

314. Title II of the ADA applies to state and local correctional facilities. *Pennsylvania Department of Corrections v. Yeskey*, 524 U.S. 206 (1998).

315. Members of the Disability Subclass are qualified individuals with disabilities. 42 U.S.C. §§ 12102, 12131(2); 29 U.S.C. § 705(20)(B).

316. A public entity must make reasonable modifications in policies, practices, or procedures when necessary to avoid discrimination on the basis of disability, and must avoid methods of administration that have the effect of discriminating against people with disabilities. 28 C.F.R. § 35.130(b)(3), (b)(7), (b)(8); id. § 41.51(b)(3)(i).

317. Shelby County has failed to make reasonable modifications necessary to afford members of the Disability Subclass equal access to the Jail's temperature-controlled housing, hygiene, and emergency-egress services, including by: housing people whose disabilities or medications impair thermoregulation in units without functioning cooling or ventilation; housing people with serious mental illness in windowless restricted housing without dayroom space;

maintaining housing and shower facilities within the medical clinic that are not ADA compliant; and maintaining an emergency detection, notification, and evacuation system that does not account for people who cannot evacuate independently.

318. Shelby County employs methods of administration—including its allocation of housing by classification, its deferral of physical-plant repairs, and its reliance on a fire watch in place of a working alarm and detection system—that have the effect of discriminating against people with disabilities.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Class and Subclasses, respectfully request that this Court:

a. Certify this action as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(2), certify the Class and Subclasses defined above, appoint Named Plaintiffs as class representatives, and appoint the undersigned as class counsel;

b. Declare that the conditions at the Jail alleged in Counts I through VI violate the Fourteenth Amendment rights of pretrial detainees and the Eighth Amendment rights of sentenced prisoners confined there;

c. Declare that Shelby County's policies, practices, and methods of administration alleged in Count VII violate Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act;

d. Enter a preliminary and permanent injunction requiring Defendants to maintain temperatures in all occupied areas of 201 Poplar—measured inside occupied cells with the cell doors closed, and including the intake and booking areas—at or below the maximum permitted by Tennessee's minimum standards for local correctional facilities;

e. Enter a preliminary and permanent injunction requiring Defendants to provide and maintain mechanical ventilation to every occupied cell and housing area at 201 Poplar, including supply air delivered into each occupied cell with the cell door closed and a corresponding return or exhaust path, at rates meeting the applicable ventilation standard, continuously and without overnight setback, and to document airflow rates through a qualified technician;

f. Enter a preliminary and permanent injunction requiring Defendants to place and maintain in working order a fire alarm, detection, and notification system at 201 Poplar that is connected to the responding fire department, and to maintain the egress, door, lock, drill, and staffing measures necessary to evacuate the facility's occupants;

g. Enter a preliminary and permanent injunction limiting the period any person may be held in the intake and booking area before being assigned to a housing unit with a bed, and limiting the period any person may be held in a cell or unit with no access to natural light or held without access to recreation;

h. Enter a preliminary and permanent injunction requiring Defendants to remediate mold, repair drainage and plumbing so that water does not pool in occupied areas, maintain sewage conveyance in working order, and eliminate pest infestation in housing areas;

i. Enter a preliminary and permanent injunction requiring Defendants to make the reasonable modifications necessary to afford members of the Disability Subclass equal access to the Jail's services, programs, and activities, including emergency egress;

j. Retain jurisdiction to monitor compliance, and appoint a neutral expert or monitor under Federal Rule of Evidence 706 and 18 U.S.C. § 3626(f) to assess and report on compliance;

k. Award Plaintiffs their reasonable attorneys' fees, costs, and expenses under 42 U.S.C. § 1988, 42 U.S.C. § 12205, and 29 U.S.C. § 794a; and

l. Grant such other and further relief as the Court deems just and proper.

Dated: September 14, 2026

Respectfully submitted,

*/s/ Benjamin A. Gastel*

Benjamin A. Gastel (BPR #28699)
Tricia R. Herzfeld (BPR #26014)
Stella Y. Yarborough (BPR #33637)
**Herzfeld, Suetholz, Gastel, Leniski & Wall, PLLC**
1920 Adelicia St., Ste 300
Nashville, TN 37212
Ph: 615-800-6225
Fax: 615-994-8625
ben@hsglawgroup.com
tricia@hsglawgroup.com
stella@hsglawgroup.com